IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROY AND SHEILA BOWERS,

Plaintiffs,

vs.                                    Case No. 10-4141-JTM

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., ET AL,

Defendants.

MEMORANDUM AND ORDER

In 2009, Roy and Sheila Bowers commenced negotiations for a new home loan
with their existing lender, defendant Wells Fargo. The proposed new loan was never
closed, but, owing to the mistake of the scheduled closing agent, Wells Fargo was
mistakenly informed that the closing had occurred. It mistakenly released its prior lien.
After it discovered and sought to correct the error, the Bowerses commenced the
present action seeking millions of dollars in damages for various tort and statutory
claims. The matter is before the court on the Motion for Summary Judgment (Dkt. 230)
of the defendants Wells Fargo, and its agents Mortgage Electronic Registration Systems
and Lorna Slaughter.

The court finds that the action is ripe for summary judgment. The parties have already engaged in exhaustive discovery of the Bowerses' claims, and the Bowerses fail to identify with any specificity any additional discovery which would be materially relevant to their allegations, or which would not be duplicative of that already produced. The plaintiffs have had ample opportunity to prepare their response to the defendants' summary judgment motion, and, rather than await the defendants' supplemental disclosures, indeed filed their response two weeks ahead of the scheduled deadline.

*Findings of Fact*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P.  56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The court's findings of fact exclude requested findings which are not supported by a particular citation to admissible evidence, which are clearly irrelevant, or which are not referenced in the citing party's argument. *See Shepard v. Sullivan*, 65 Fed. Appx. 677, 2003 WL 1565155 (10th Cir. Mar. 27, 2003); *Coleman v. Blue Cross Blue Shield*, 287 Fed. Appx. 631, 635 (D. Kan. July 8, 2008).

3

For the last 15 years, Roy Bowers has been an over-the-road, 18-wheel truck driver with the same trucking company. He usually has a dedicated route from Topeka, Kansas to Michigan, and his route also can take him through Ohio, Indiana, Arkansas, Tennessee, Mississippi, and sometimes Wisconsin. His driving schedule fluctuates, but typically keeps him away from home around five nights a week.

Since in or around 2009, Sheila Bowers has not been employed outside the home. Before that, Sheila Bowers ran a child care center, overseeing its financial operation and interacting with parents. She has previously supervised an eleven-person maid service at a hotel in Topeka, Kansas.

On March 28, 2007, the Bowerses bought the residential property located at 6235 NE Kendall Wood Drive in Topeka from the contractor who built it. Roy Bowers made a down-payment and financed the remainder of the purchase price through a mortgage loan that came to be serviced by EMC Mortgage Corporation.

This was not Roy Bowers' first time taking out a mortgage to buy property in Topeka. The first time he took out a mortgage was in the 1970s.

When they arrived at the closing, the Bowerses learned that what they thought would be a fixed-rate mortgage loan was actually a variable/adjustable rate mortgage. Sheila Bowers hesitated to take out the loan due to the adjustable interest rate, but Roy Bowers decided to close. He was the only borrower on the loan and, in the Bowerses' marriage, Roy Bowers is the final decision-maker. Roy Bowers decided to take out the adjustable rate mortgage loan because he intended, within two years, to refinance to a

4

fixed rate loan.

On October 9, 2008, Roy Bowers took out a new loan to pay off his adjustable rate loan with EMC Mortgage. When the new loan paid off EMC Mortgage, the balance paid to EMC Mortgage was $172,982.12.

To refinance the EMC Mortgage loan, on October 9, 2008, the Bowerses together attended a loan closing at Kansas Secured Title in Topeka. The new loan had a fixed rate of 7% on a principal balance of $184,222.00.

At the closing, Roy and Sheila Bowers executed both a  Promissory Note in the principal sum of $184,222.00, payable to Security National Mortgage Company and its successors and assigns, and a real estate mortgage to Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for lender Security National.1

As a first-priority lien, the Mortgage mortgaged, conveyed, and warranted the Bowerses' interests as fee simple owners of the Property, which is legally described as:

> LOT 3, BLOCK D, INDIAN VALLEY SUBDIVISION II, SHAWNEE COUNTY, KANSAS.

The Mortgage was recorded in the Shawnee County, Kansas Register of Deeds on October 16, 2008.

---

1

     In addition, Roy Bowers also executed (1) a Request for Taxpayer Identification Number and Certification; (2) a Request for Transcript of Tax Return; (3) a Request for Copy of Tax Return; (4) a Truth-in-Lending Disclosure Statement; (5) a Good Faith Estimate; (6) Consent to Social Security Administration's Release of Social Security Number Verification; (7) a Payment Letter to Borrower; (8) an Initial Escrow Account Disclosure Statement; (9) an Addendum to HUD-Settlement Statement; and (10) a Mortgage Servicing Transfer Disclosure. Both Roy and Sheila Bowers executed (1) a HUD-1 Settlement Statement, indicating the payoff of the EMC Mortgage Corporation loan in the amount of $172,983.12; (2) an Itemization of Amount Financed; (3) a Federal Truth-in-Lending Disclosure Statement; (4) a Notice of Right to Cancel; and (5) Signature Affidavit and AKA Statement.

5

After closing on the First Mortgage Loan, the balance owed by Roy Bowers for his mortgage had increased by $11,239.88.

The Bowerses have no complaints about taking out the First Mortgage Loan. They were assisted by their counsel in this case, and by the mortgage brokerage owned by plaintiffs' counsel, HomeQuest Mortgage, located in Oskaloosa, Kansas.

The First Mortgage Loan carried a mortgage insurance policy issued by the Federal Housing Administration, a part of the federal Housing and Urban Development Department. Section 2 of the Mortgage discusses the requirement that Roy Bowers pay an annual mortgage insurance premium or "MIP."

The FHA/HUD's official government website directs viewers to the following explanation about mortgage insurance for FHA loans: "FHA loans have been helping people become homeowners since 1934. How do we do it? The Federal Housing Administration (FHA) — which is part of HUD — insures the loan, so your lender can offer you a better deal." The website also provides that the FHA

> provides mortgage insurance on loans made by FHA-approved lenders throughout the United States and its territories. FHA insures mortgages on single family and multifamily homes including manufactured homes and hospitals. It is the largest insurer of mortgages in the world, insuring over 34 million properties since its inception in 1934.

FHA explains further that its "mortgage insurance provides lenders with protection against losses as the result of homeowners defaulting on their mortgage loans. The lenders bear less risk because FHA will pay a claim to the lender in the event of a homeowner's default." Finally, the FHA is identified as "the only government

agency that operates entirely from its self-generated income and costs the taxpayers nothing. The proceeds from the mortgage insurance paid by the homeowners are captured in an account that is used to operate the program entirely."

A FHA/HUD mortgage insurance policy is issued in favor of the lender. The insurance policy insures the lender against a loss caused by the borrower defaulting on the loan.

Based on later events, the Bowerses have correctly alleged that "Roy Bowers no longer has an FHA loan" and "Roy and Sheila Bowers no longer have an FHA Mortgage or case number." (Dkt. 204 at ¶¶ 11-12).

By the Mortgage Servicing Transfer Disclosure which Roy Bowers executed at closing, SecurityNational informed the plaintiffs that it does not service mortgage loans, and that it intended to sell the service of the loan to another company. Within a month of the closing, the loan was bought by defendant Wells Fargo. With this purchase, the right to service the First Mortgage Loan was transferred from SecurityNational to Wells Fargo effective on or about October 30, 2008. The original Note is currently located in the vault of the defendant's law firm and was inspected by plaintiffs' counsel on February 24, 2012.[2] The Note was endorsed by SecurityNational to Wells Fargo, and

---

[2]

    In 2010, a Wells Fargo representative also executed a Lost Note Affidavit when its initial search for the original 2008 Note could not be located. A copy of the Lost Note Affidavit was viewed by plaintiffs' counsel on the same day  she examined the original Note, February 24, 2012. The Bowers have acknowledged that they did not know of the existence of the Affidavit until February 2012, a document which has never been relied on by Wells Fargo, and which has never been submitted to any Court in an action by Wells Fargo against the Bowers. Given the uncontroverted evidence before the court, including the sworn affidavit of Wells Fargo Vice President of Loan Documentation, duly authenticated under the Kansas U.C.C. pursuant to K.S.A. 84-3-401(b), and Roy Bowers own direct admission to his signature on the original Note, the court finds the document identified as Exhibit A to

then endorsed by Wells Fargo in blank.

Wells Fargo has serviced the First Mortgage Loan from on or about October 30, 2008 to the present. As servicer of the First Mortgage Loan, Wells Fargo collects payments of principal and of interest, administers the escrow account for property taxes and hazard insurance, monitors the  compliance of Roy Bowers' obligations under the Note and the both Bowers' obligations under the Mortgage, and is authorized to enforce the Note and Mortgage upon default. After it began to service the First Mortgage Loan, Wells Fargo assigned loan number [......]3435 to the account.

The Bowerses made monthly payments pursuant to billing statements from Wells Fargo containing this loan number from approximately December 2008 through June 2009. The Bowerses sent their monthly mortgage payments (comprising an installment payment of principal and a payment of interest, property taxes, hazard insurance, and mortgage insurance) to Wells Fargo pursuant to these billing statements on account [......]3435. The Bowerses generally made these payments timely, although the payment for May 2009 was late, and Roy Bowers incurred a late charge.

The Bowerses' monthly mortgage payment was $1,786.16 through May 2009. As of November 2009, the payment amount was $1,835.94.

Just seven months after they closed on the 2008 loan, the Bowerses began to communicate with Wells Fargo to refinance. They intended to take out a new loan with Wells Fargo secured by a new mortgage on the Property. The proceeds from the

---

defendants' Answer is an authenticated copy of the Note executed by Roy Bowers in 2008.

Proposed New Loan would pay off and satisfy the First Mortgage Loan. Roy Bowers testified:

> Q. So is it fair to say then that you and Mrs. Bowers wanted to have a lower interest rate —
> A. Interest rate.
> Q. than 7 percent?
> A. Yes. That was really the reason for our refinancing is we get a lower interest rate.
> Q. Okay.
> A. And not remodify. Just refinance.
> Q. Just refinance the loan? Just take out a new loan, right?
> A. Yeah.
> Q. And that's basically what you had done there in October of 2008?
> A. Uh-huh.
> Q. You'd taken out a new loan to pay off EMC, right?
> A. Yeah.

On May 19, 2009, Perla Gonzalez, a home mortgage consultant with Wells Fargo, sent the Bowerses an informational package about the process of applying for the proposed new loan. Gonzalez also provided for the Bowerses' review a truth-in-lending statement, a good-faith estimate, and loan disclosure documents. The Bowerses have admitted receiving these papers, which indicated  an "Anticipated Closing Date" of June 24, 2009.

Because of Roy Bowers' driving schedule, Sheila Bowers handles most of the actual bills. She reviews the mail, including mail directed only to Roy Bowers. However, the Bowerses routinely discuss financial matters with each other, and Sheila Bowers will tell Roy Bowers when mail of a financial nature has arrived. The Bowerses make financial decisions together, as Roy Bowers believes that reaching agreement on

financial matters is important in a marriage.

Although Perla Gonzalez sent the May 19, 2009 informational package to the Bowers, they usually communicated about the proposed new loan with Wells Fargo representative Crystal Medina.

Under the new loan, Roy Bowers would be the only borrower, there would be a mortgage insurance policy issued by FHA/HUD, the term of the loan would be 30 years, and the Bowerses would escrow their real estate taxes, hazard insurance, and mortgage insurance premium with Wells Fargo. The new loan would have a fixed interest rate at 4.875% per annum and the unpaid principal balance would be $192,518.00. The first payment on the loan would be due August 1, 2009, and the final payment would be due July 1, 2039.

The Bowerses' deposition testimony establishes that they agreed to execute a mortgage to secure repayment of the new loan. Sheila Bowers affirmatively acknowledged that she and her husband would still accept a mortgage on the property today:

> Q.  And you're willing to have a mortgage, you just want it to be on —
> A.  I just want to see what terms we could come up with. What terms.
> Q.  And if you agree with the terms, you would be okay to have a mortgage on your property?
> A.  Yes.

A January 26, 2012 Reuters article about this case quoted the Bowerses as indicating that the proposed new loan would save them $198.86 each month, which is the to-the-penny difference between $1,786.16 (the actual monthly payment directly

before the proposed new loan was to close) and $1,587.30 (the monthly payment made on July 27, 2009, after Wells Fargo believed the Bowerses had closed on the Proposed New Loan).

Crystal Medina wrote the Bowerses a one-page instruction letter about applying for a loan with Wells Fargo. Among other information, the letter informed the Bowers:

> Your active participation, prompt response, and concerned questions will help to ensure success and expedite your loan process....
>
> ***At the end of your loan process***, you will receive a survey. This survey is based on a scale from 1-5 …

(Emphasis added).

On May 26, 2009, Sheila Bowers went to an Office Depot in Topeka, Kansas and faxed to Crystal Medina a multi-page loan application signed by Roy Bowers. This application included a document that Roy Bowers executed on May 24, 2009, entitled "Borrower's Certification/Verification Authorization/Financial Privacy Notice" in which Roy Bowers stated that he had applied for credit from Wells Fargo.

Wells Fargo approved Roy Bowers' request to refinance the first mortgage loan with the proposed new loan, conditioned on the Bowerses executing loan documents, including a new promissory note executed by Roy Bowers and a new mortgage executed by both Roy and Sheila Bowers. The proceeds of the refinance would satisfy the First Mortgage Loan in full.

Wells Fargo arranged for Transcontinental Title Company to serve as the parties' closing agent. Transcontinental Title was to arrange for a notary to meet with the

Bowerses for them to execute a mortgage on the Proposed New Loan, for Roy Bowers to execute a promissory note, and for the Bowerses to execute various other loan documents for the Proposed New Loan. After execution, these documents were to be sent by Transcontinental Title to Wells Fargo. A HUD-1 Settlement Statement (an accounting for how the proceeds of the loan, closing costs, and the like are to be disbursed at a loan closing) was prepared by Transcontinental Title for the Proposed New Loan.

The anticipated closing date of the new loan was June 24 or June 25, 2009. This was the same time frame indicated in the informational package sent by Perla Gonzalez to the Bowerses on  May 19, 2009.

Wells Fargo prepared the closing papers for the new loan, including a new promissory note, new mortgage, and other loan documents and uploaded those documents to a website on June 25, 2009. A Transcontinental representative downloaded them that same day. With the approval of the HUD-1, the closing was in the hands of the title company.

The Bowerses assert that no one from Wells Fargo or Transcontinental Title discussed a closing date with them for the new loan, or informed them that they had to execute loan documents in front of a notary. Wells Fargo's business records demonstrate that Crystal Medina communicated with the Bowerses on June 16 and 22, indicating that a closing would take place in June 2009. She discussed the specific dates of June 24th or June 25, 2009. Further, it is uncontroverted that the same business

records show that Medina also telephoned or left messages with the Bowerses on May 20, May 21, May 28, June 4, June 10, June 18, and June 19, 2009.

Ultimately, this issue is controlling. It is uncontroverted that the proposed new loan did not in fact close. The Bowerses never executed a mortgage reflecting the proposed new loan, and Roy Bowers never executed a promissory note for $192,518.00. The Bowerses did not attend a closing and did not execute any loan documents in front of a notary.

However, on June 30, 2009, Transcontinental Title contacted Wells Fargo and stated erroneously that the loan had closed.

This was the last day of the month, and Crystal Medina was not in the office. Transcontinental Title spoke with her supervisor, Michelle Maxson, who approved its request for Wells Fargo to immediately wire closing costs to fund the new loan. Relying on the parties' closing agent, Wells Fargo wired $1,841.86 for closing costs on June 30, 2009. This was the amount needed to fund the loan, because this was a Wells Fargo loan being refinanced by Wells Fargo — Wells Fargo did not wire to Transcontinental Title any portion of the $192,518.00 requested by Roy Bowers in applying for the loan.

Wells Fargo funded the Proposed New Loan internally by establishing an account containing $192,518.00 in Roy Bowers' name that was associated with loan number [......]8547 (that is, the loan number for the proposed new loan). It also arranged for the balance of the First Mortgage Loan ($183,258.21 as of June 30, 2009) to be paid off and satisfied.

13

Wells Fargo funded and disbursed money under the belief that it had received a new lien of equal priority. But the Bowerses failed to give Wells Fargo such a new lien, because they did not execute a new mortgage or, for that matter, any other loan documents, in connection with the proposed 2009 loan.

Wells Fargo also expected that it would receive a new promissory note from Roy Bowers for $192,518.00 but Roy Bowers never executed such a note.

Without any explanation since, at no point did the Bowerses contact Wells Fargo to reschedule the closing. The Bowerses had no communications with Crystal Medina after June 25, 2009, and no communications with Perla Gonzalez after receiving the May 19, 2009 loan informational package.

The funding of the new loan triggered a number of automated events at Wells Fargo, for which timeliness is a major consideration. Most states have statutes containing short time frames in which a mortgage must be released when the debt has been satisfied. In this case, it resulted in Wells Fargo taking prompt, automated action when it was advised that a refinance had occurred.

On July 1, 2009 — four business days after the loan was supposed to have closed — the Bowerses received a form letter with Crystal Medina's signature. It contained the survey that Crystal Medina described to the Bowerses in her instructional letter sent in May 2009. This letter speaking in the past tense, requested the Bowerses' input on how the loan process went. Among other things, the letter advised the Bowerses to contact Crystal Medina or her manager, Tim Bierman, if the Bowerses had any concerns:

14

It was a pleasure working with you ...

In the next few weeks you will receive a survey by mail asking for your input on how the process went. This is how Wells Fargo measures the customer service I provided to you. I hope you can give me a 5 on the first question which asks about your overall experience.

If you feel that I did not provide level 5 service, please call me or my manager to discuss your concerns. My manager, Tim Bierman, can be reached at 612-[xxx-xxxx].

It has been a pleasure working with you … Again, thank you for choosing Wells Fargo for your home financing needs …

The Bowerses did not contact Crystal Medina or Tim Bierman after receiving the July 1, 2009 letter, even though telephone numbers for both were included in the letter.

On July 6, 2009, Wells Fargo wrote the Bowerses to confirm that the 2008 loan had been paid off:

Congratulations! We are pleased to inform you that we have processed the funds necessary to pay your loan in full. We are providing the following information to address any questions you may have and to let you know what to expect through the loan payoff process.

We will notify [] HUD of the payoff of your loan … w[e] will mail loan satisfaction documents to you or your county recorder …

If you have any questions about your loan payoff, our service representatives can help you. They can be reached at (866) 234-8271 …

Thank you for  refinancing your loan with Wells Fargo …

Again, in spite of receiving the July 6, 2009 letter, the Bowerses did not contact Crystal Medina or anyone else at Wells Fargo to advise that they had failed to execute the loan documents at the closing.

On July 15, 2009, Wells Fargo recorded a Certificate of Satisfaction concerning the

15

Mortgage with the Shawnee County, Kansas Register of Deeds. The Certificate was executed on July 3, 2009, by Lily Chiu, a Vice President of MERS. With the satisfaction of the Mortgage, Wells Fargo notified FHA/HUD and it retired the case number associated with the Mortgage, as the mortgage insurance policy was now terminated.

Wells Fargo subsequently sent the Bowerses four monthly mortgage statements indicating that their loan number was now [......]8547. These statements reflected the monthly payments due for the months July 2009 to October 2009, under the terms of the proposed new loan. These statements indicated that the interest rate on the loan was 4.875%; that the property address was 6235 NE Kendall Wood Drive, and that the unpaid principal balance was an amount near $192,518.00.

The Bowerses made their first payment on account [......]8547 on July 27, 2009, in the amount of $1,587.30. Of that sum, $236.72 went to principal. The Bowerses' next monthly statement thus showed the unpaid principal balance of the loan as $192,281.28 ($192,518.00 minus $236.72 from the July 27, 2009 payment).

Without objection, the Bowerses paid each of the four monthly statements for account [......]8547. Indeed, $1,587.30 is the amount the Bowerses paid each month from July 27, 2009 to October 2010.

In or around August 2009, Transcontinental Title returned the closing fee of $1,841.86 to Wells Fargo. Wells Fargo concluded that the new loan had never been consummated, and reinstated the 2008 loan in its records and servicing operations. It then applied each of the Bowerses' monthly payments of $1,587.30 on Account No.

16

[......]8547 to the debt as it existed on the 2008 loan (Account No. [......]3435).

From November 2009 onward, the monthly mortgage billing statement that Wells Fargo sent the Bowerses contained the loan number and loan terms associated with the 2008 loan; it never sent any further billing statements reflecting the putative 2009 loan.

At the time the Certificate was recorded regarding the 2008 loan, the Bowerses had not had not satisfied the debt evidenced by the 2008 Note and Mortgage. It was not the Bowerses who advanced the $183,258.21 to discharge and satisfy the debt; those funds came from Wells Fargo. To date, the debt evidenced by the 2008 Note and Mortgage has not been paid or satisfied by the Bowers. The account associated with the 2008 loan showed a zero balance only because of Wells Fargo's mistaken transfer of funds on July 1, 2009, after Transcontinental Title informed it that the Bowerses had attended a closing for the proposed new loan.

Because the Bowerses did not execute a new mortgage for the Proposed New Loan, to protect its interest in the now-unencumbered Property, Wells Fargo recorded a Caveat as to the Existence of a Mortgage Lien Due to Erroneous Release of Mortgage ("Caveat") with the Shawnee County, Kansas Register of Deeds.

Sheila Bowers believes the term "erroneous" means "something's not done right."

Recorded on November 20, 2009, the Caveat provided, among other things, that the release of the Mortgage was in error; that the Mortgage dated October 9, 2008,

17

continued to exist; and that the underlying debt had not been paid. The Caveat also provided that "the underlying debt obligation owed by [the Bowers] … has not been fully paid, not satisfied, nor discharged, but, instead, continues to exist." The Caveat was prepared by an attorney who Wells Fargo retained to assist with the situation. Neither Wells Fargo nor MERS has disclaimed the Caveat or challenged its propriety.

Lorna Slaughter, who has worked for Wells Fargo or a predecessor entity for over twenty years, executed the Caveat. From 1996 to the present, Slaughter has been in the same department at Wells Fargo (servicing operations support), which handles boundary line adjustments, correcting errors in legal descriptions, preparing partial deed releases when a borrower sells vacant land covered by a mortgage, and reinstating mortgages released in error. In her role as an employee of the Land Transactions & Servicing Support Department at Wells Fargo, Slaughter is a Vice President of MERS.

The Bowerses did not know the Caveat existed until their counsel located it in the course of preparing this lawsuit.

Neither Roy Bowers nor Sheila Bowers have ever spoken to, met, or communicated orally or in writing with Lorna Slaughter. According to Sheila Bowers, "I don't have any views about her so I don't know how. I cannot really comment on the Caveat. Because I have not never met the lady." According to Sheila Bowers at her August 1, 2011 deposition, "I have no idea who MERS is."

Until the fact was brought to his attention at this deposition on March 28, 2012, Roy Bowers was not aware he had filed suit against Lorna Slaughter. Bowers testified

18

that, in his mind, Lorna Slaughter and Wells Fargo go hand-in-hand. Although he seeks

$16 million personally from Lorna Slaughter, Bowers does not believe she bore him any

ill will:

> Q.  Now, do you know whether you have sued Wells Fargo?
>
> A.  Oh, well, yeah. I mean, I think Mrs. Slaughter and Wells Fargo is all
> running hand-in-hand, I believe.
> . . . .
> Q.  What about Lorna Slaughter, do you have any reason to believe that
> she has any ill will towards you?
>
> A.  No, I don't have any reason to believe it.

In executing their Mortgage on October 9, 2008, the Bowerses had agreed that

they were giving the "Security Instrument [] to MERS, (solely as nominee for Lender []

and Lender's successors and assigns), as mortgagee." They also acknowledged in the

2008 Mortgage that they

> understand[] and agree[] that MERS holds only legal title to the interests
> granted by Borrower in this Security Instrument; but, if necessary to
> comply with law or custom, MERS, (as nominee for Lender and Lender's
> successors and assigns), has the right to exercise any or all of those
> interests, including, but not limited to … releasing or canceling this
> Security Instrument.

The essence of MERS' business is to hold and record legal title to mortgages and

deeds of trust on behalf of the beneficial owners. The MERS System is designed to allow

its members (which include originators, lenders, servicers and investors) to accurately

and efficiently track transfers of servicing rights and beneficial ownership in notes that

are secured by the mortgages and deeds of trust with which MERS is involved.

The mortgage or deed of trust grants a security interest in the subject property to Mortgage Electronic Registration Systems, Inc. as beneficiary or mortgagee, as nominee for the lender and the lender's successors and assigns. Mortgage Electronic Registrations Systems, Inc. holds legal title to the interests granted by the lender in the mortgage or deed of trust and generally has the right, as beneficiary or mortgagee, as nominee for the lender, to exercise any or all of the lender's rights under the mortgage or deed of trust.

As long as the sale of the associated promissory note for the loan involves MERS Members, MERS remains the named mortgagee of record, and continues to act as the mortgagee, as the nominee for the new beneficial owner of the note. The seller of the note need not assign the mortgage because MERS remains the mortgagee, as the nominee for the purchaser of the note, who is then the lender's successor or assign.

Because MERS serves as agent for the originating lender and its successors and assigns, MERS and its members have contractually agreed to rules and practices that govern their relationship. Membership in MERS is generally governed by three agreements—(1) MERS System Rules of Membership; (2) MERS System Terms and Conditions; and (3) MERS System Procedures Manual, which are publicly available on MERS' website (www.mersinc.org). Pursuant to MERS' Rules, MERS agrees to at all times comply with the instructions of the holder and beneficial owner of mortgage loan promissory notes.

According to MERS' records, the Roy Bowers' promissory Note was transferred

to Wells Fargo on October 31, 2008. As of the time the Note was transferred to Wells Fargo and at all times since, Wells Fargo was a member of MERS subject to MERS' Terms and Conditions and Rules of Membership.

To fulfill certain acts required of the mortgagee, MERS acts through certifying officers. It appoints these officers to act on its behalf by issuing a corporate resolution appointing persons who are officers or employees of its Members as assistant secretaries and vice presidents of MERS.

MERS' records show that a corporate resolution was issued on December 15, 2008, appointing Lily Chiu, Lorna Slaughter, and Ed Debus (among other employees at Wells Fargo) as assistant secretaries and vice presidents of MERS. These individuals were authorized under the Corporate Resolution to, among other things, release mortgage liens, execute affidavits related to lost promissory notes, and to take any such actions and execute such documents as may be necessary to fulfill the Member's servicing obligations.

Because MERS was the mortgagee under the 2008 Mortgage that was released of record by the Certificate of Satisfaction recorded on July 15, 2009, Lorna Slaughter executed the Caveat in her role as a signing officer of MERS.

Although the Bowerses have sued Lorna Slaughter and MERS for slander of title and other claims relating to the Caveat, Sheila Bowers could not explain at her deposition how the Caveat harmed the Bowers:

Q.  All right. My question is a little bit different. You've said in paragraph

21

22 of your lawsuit that the defendants continue to make defamatory remarks about — because of Exhibit 17 [the Caveat]. And I'm asking you everything you see in Exhibit 17

A. Uh-huh.

Q. — that is harmful to you or that is inaccurate.

A. Oh, so it's harmful? What would be harmful?

Q. Or inaccurate.

A. I don't — I don't know.

Until Wells Fargo was permitted to intervene in this case (over the Bowerses' objection), the plaintiffs' claims relating to the Caveat were against MERS and Lorna Slaughter.


According to Sheila Bowers:

Q. What is it about Exhibit 17 that has caused you to file suit against Lorna Slaughter and MERS?

A. Well, I don't know — I don't know Lorna Slaughter, so I can't name on that. I haven't talked to her personally or anything like that. So I don't have any views about her so I don't know how. I cannot really comment on the Caveat. Because I have not never met the lady.

Q. Okay. What about MERS, have you ever met MERS?

A. No, ma'am.

Q. Okay.

A. I have no idea who MERS is.

Roy Bowers does not believe MERS bore him any ill will:

22

Q. What about MERS, do you think that MERS has an intention to hurt you?

A. I haven't had any contact with MERS. I don't really even know who MERS are, so.

The Bowerses have not filed suit because Ms. Chiu executed the Certificate on

July 9, 2009. Instead, they allege in their Amended Complaint:

There was a statutory duty to release the Mortgage when the specific Note and FHA case number were satisfied or closed. Therefore, there is a subsequent duty to refrain from interference with that release. When MERS and Lorna created, signed, and caused to be filed the Document falsely stating there was an erroneous release of mortgage, they breached that duty.

As to the Caveat, however, the Bowerses are seeking damages of $16,530,000.00. Their

verified interrogatory responses state that they seek

statutory damages at $20,000 per individual which have been calculated and provided previously on a per day basis which was $16,530,000.00 on or around the settlement conference on June 2, 2011. In the alternative there are 43 false statements, unconscionable acts, and/or deceptive practices for a total of $1,290,000.00 all included in the "Caveat" and/or by filing the "Caveat."

Although he is not certain that he will recover such a large amount, Roy Bowers

is still seeking it from each of the three Defendants:

Q. No, I understand. But I'm just asking you about this document that you signed.

A. Yeah.

Q. And in this document you said —

A. Yes.

23

Q.  — damages per individual which have been calculated, and I skip ahead to the 16,530,000?

A. Uh-huh. That's for all — every individual one.

Q. So you're looking for 16,530,000 from Mrs. Slaughter; right?

A. Uh-huh.

Q. And you're looking for 16 million 530 —

A. Uh-huh.

Q.  — thousand from Wells Fargo; right?

A. Uh-huh.

Q. And you're looking for an additional 16,530,000 from MERS —

A. Yes.

Q.  — do I understand? Okay.


Alternatively, the Bowerses are seeking $1,290,000.00 because of the Caveat:

Q. And then you say, "In the alternative there are 43 false statements, unconscionable acts, and/or deceptive practices for a total of 1,290,000, all included in the caveat and/or by filing the caveat." Did I read that correctly?

A. Yes.

....

Q.  — I believe this to be the caveat. Is that what you understand?

A. Yeah.

Q. Okay.

.....

Q. — that's what you're referring to in this answer when you talk about the damages.

A. Yes.

Q. Isn't that true?

A. Yes.

The Bowerses acknowledge their only actual, out-of-pocket damages from the Caveat are "legal costs and lost work as a result of the legal proceeding … lost work on 6-2-2011 for the settlement conference and other costs related to legal expenses litigation."

The Bowerses admit that the only known people who they believe have seen the Caveat are themselves, their counsel, the Shawnee County, Kansas Register of Deeds, a title company, and the law firm that prepared the Caveat for Wells Fargo.

The Bowerses have lived in the residence since they bought it in 2007. They have never put it up for sale, and have no intention to do so.

Q. And Mrs. Bowers is not pressuring you to sell the house; right?

A. [By Roy Bowers] Are you kidding? That would be a long day before she'd do something like that. She ain't about to do that.

Sheila Bowers believes that "[i]f there was something that was missed, surely goodness, you know, contact people as to, you know, what – what's your next phase."

On October 29, 2009, less than four months after Transcontinental Title told Wells Fargo that the Bowerses had closed the Proposed New Loan, a Wells Fargo

representative wrote to the Bowerses to advise that Wells Fargo had received funds of $183,258.21 to discharge and satisfy the debt evidenced by the 2008 Mortgage Loan and that Wells Fargo did not intend for that fund to be used to pay off the loan, and that "Wells Fargo will continue to hold the lien against the property."

The November 2009 mortgage statement sent by Wells Fargo to the Bowerses indicated that the 2008 mortgage was delinquent and that Roy Bowers owed $5,507.82, which was the monthly payment of $1,835.94 plus $3,671.88.

When he saw the November 2009 mortgage statement on Account No. [......]3435, which indicated that the Bowerses owed $1,835.94 for their monthly payment rather than $1,587.30, Roy Bowers did not believe it was appropriate for Wells Fargo to charge the increased amount because the Bowerses had not signed any paperwork allowing Wells Fargo to charge $1,835.94 rather than $1,587.30.

On December 14, 2009, the Bowerses wrote Wells Fargo "what ever paper you[']re] saying we did not sign you all were suppose[d] to have sent it to us. [] you all breached our contract." As its reference line, the Bowerses wrote "loan no. [......]8547."

The Bowerses then made a complaint, which the executive department at Wells Fargo addressed in a letter on January 13, 2010. The letter stated that, because the Bowerses did not execute loan closing documents, the proposed new loan did not close and Wells Fargo could not continue to treat the loan as if it existed:

> I have been advised by our New Loan department that loan number 708-[......]8547 has been retracted. A retraction is removing a loan from our system. The reason your loan was retracted. was because no

closing took place and no documents were signed in the presence of a notary. Since no payoff funds were received, your old loan (708-[......]3435) remained, and you are expected to continue to comply with those terms. Your payments remain at the old loan amount of $1835.94.

Your loan is currently delinquent. If you have any questions regarding establishing a repayment plan or need payment assistance, you may contact the Loss Mitigation/Collections Department....

On or about January 20, 2010, the Bowerses made a written complaint to the federal Office of the Comptroller of the Currency (OCC), in which they demanded that their monthly payment be $1,587.30 because their refinance had gone through and because they had paid this amount each month. The Bowerses stated that "[a] company cannot go back in time like Wells Fargo is trying to do." In their complaint to the OCC, the Bowerses asked for $2,000.00 from Wells Fargo for "punitive damages and harassment."

Among the papers that the Bowerses submitted to the OCC with their complaint was a June 18, 2009 payoff statement from Wells Fargo addressed to them. The payoff statement was for the 2008 loan and indicated that the information about the amount needed to satisfy and discharge the loan was "accurate until 07-01-09."

On February 5, 2010, Tami Crooks at Wells Fargo addressed the Bowerses' complaint to the OCC. Wells Fargo denied the Bowerses' request for $2,000.00 for "punitive damages and harassment," and again explained what had occurred when the Bowerses did not execute loan documents for the Proposed New Loan:

Our records reflect your refinance loan application was approved

27

and clear to close on June 24, 2009. The closing documents were sent to the title company on June 25, 2009. The loan was inadvertently funded and a wire was sent to the title company prior to confirmation of receiving the signed closing documents.

Once WFHM was notified that you did not sign the closing documents, we retracted the loan … Your old (current) loan was reinstated on October 29, 2009, and you were required to continue to comply with the loan terms since no closing took place for the refinance. WFHM respectfully denies your request to be reimbursed $2,000.00.

On February 12, 2010, the Bowerses wrote Wells Fargo to advise they would "keep on paying $1,587.30 per month on a 30-yr fixed rate interest rate 4.875%." The Bowerses wrote "I'm seeing now you all have lied."

From the time the Bowerses received Wells Fargo's letter advising that the Proposed New Loan had been retracted, the Bowerses continued to remit monthly payments to Wells Fargo in the amount of $1,587.30 as if the proposed new loan were still in place. For example, they would alter the monthly mortgage statements they received after November 1, 2009, such that, in Sheila Bowers' handwriting, the reference line to loan 3435 was crossed off and the reference line would read, in Sheila Bowers' handwriting, the number 8547. The amount owed was also crossed off.

These payments were insufficient to pay the terms of the 2008 loan, which required from November 2009 through 2010 a monthly payment of $1,835.94.

In an effort to work with the Bowers, Wells Fargo accepted the Bowerses' payments of $1,587.30 and would hold them in suspense until such time as an amount existed sufficient to pay a monthly payment on the 2008 loan terms. Wells Fargo would

28

then apply that payment. Wells Fargo also made numerous collection-related telephone calls to the Bowers. As time went on, the First Mortgage Loan became further in default.

In fall 2010, approximately a year after Wells Fargo first advised the Bowerses that the terms of the 2008 loan were reinstated, Wells Fargo referred the First Mortgage Loan to a foreclosure law firm in Kansas. At the time of the referral, the loan was due for the June 1, 2010 payment.

Section 18 of the Mortgage and Section 6(c) of the Note provide for the recovery of Wells Fargo's attorneys' fees and expenses from Roy Bowers. Section 18 of the Bowerses' Mortgage provides that "Lender shall be entitled to collect all reasonable expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorney fees, to the extent allowed by applicable law." Section 6(c) of the Note provides that "Lender may require Borrower to pay costs and expenses including reasonable and customary attorneys' fees for enforcing the Note to the extent not prohibited by applicable law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of the Note."

On August 4, 2011, during the time when Plaintiffs' counsel had requested a stay of the lawsuit, Sheila Bowers wrote defendants' counsel to ask that MERS release the Caveat:

> The loan you refer to was paid in full and the mortgage was properly released. MERS should have no interest in our property … Please release the Caveat … We have attached a copy of the document to your letter.

The letter offered no assurance that the Bowerses would not encumber the Property if

the Caveat were released. The letter also contained no offer to execute a mortgage to reflect what Mrs. Bowers had just testified to at her August 1, 2011 deposition — that the Bowerses intended for the Proposed New Loan to be secured by a mortgage on the Property.

In 2010, Sheila Bowers contacted HUD for assistance in addressing her mortgage with Wells Fargo. HUD declined to address the matter, stating that it had no interest associated with the mortgage at that time.

*Conclusions of Law*

The Bowerses bring claims against the defendants for slander of title, conversion, fraud, negligence, and violations of the Kansas Consumer Protection Act (KCPA), and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605. In light of the uncontroverted facts, summary judgment is appropriate as to each of these claims.

Slander of title is the issuance of a false and malicious statement disparaging another person's title to real property and thereby damaging his interests. *Safety Fed. Sav. & Loan Ass'n v. Thurston*, 648 P.2d 267, 270 (Kan. App. 1982) (citing 50 AM.JUR.2d, Libel & Slander § 539, p. 1058); *Petroleum Energy, Inc. v. Mid-Am. Petroleum*, 775 F. Supp. 1420 (D. Kan. 1991). The requirement that the statement be malicious requires proof that the defendant did not act in good faith. *Watkins v. Conway*, 124 Kan. 79, 257 P. 937, 939 (Kan. 1927).

The Bowerses' slander of title claim rests on the recording of Caveat, but that

document could not slander their title for the simple reason that it was true – the Bowerses had not satisfied their obligations on the prior loan, and that the prior mortgage had been released in error. Accordingly, Wells Fargo was simply reasserting its claim on the property in a manner consistent with Kansas law. See *N. River Ins. Co. v. Aetna Fin. Co.*, 352 P.2d 1060, 1066 (Kan. 1960) (lender who "mistaken[ly] release[s] a real estate mortgage" may "assert[] the lien of the mortgage upon discovery of the mistake").

Nor was the Caveat malicious. In this context, maliciousness means doing a harmful act without an reasonable justification or excuse. *Saddlewood Downs v. Holland Corp.*, 33 Kan. App.2d 185, 198, 99 P.3d 640, 648 (2004) (quoting *Werdann v. Mel Hambelton Ford*, 32 Kan.App.2d 118, Syl. ¶ 14, 79 P.3d 1081 (2003)). The Bowerses have produced no evidence that the defendants did not act in good faith in recording the Caveat, because Wells Fargo had a valid justification. "[I]t is clear that a mortgagee's duty to release a mortgage arises only when … the mortgage covers real property in which the mortgagor had no interest." *Weninger v. First Nat'l Bank*, 223 P.2d 716, 717 (Kan. 1950). The Bowerses have conceded that Wells Fargo retains some interest in the property, and thus it was not obliged to allow the record to continue to erroneously reflect that the property was unencumbered. By issuing the Caveat, the defendants advanced the public interest by warning third parties that the property was indeed subject to an existing and unsatisfied obligation.

Finally, though, it must be stressed that such third parties are hypothetical only.

That is, the Bowerses have remained in the Property. They have not attempted to sell it, and have no plans to do so. Indeed, the Caveat was only discovered in the consequence of the present litigation. Accordingly, the plaintiffs have failed to demonstrate that they have been damaged in any way by the recording of the Caveat.

Conversion under Kansas law is the unauthorized exercise of dominion and control "goods or personal chattels belonging to another." *Lindemuth v. Judd*, No. 102,143, 2010 WL 5481739, at *3 (Kan. App. Dec. 30, 2010) (quoting *Bomhoff v. Nelnet Loan Servs.*, 279 Kan. 415, 421, 109 P.3d 1241 (Kan. 2005)). A mortgage lien interest is not an interest that is capable of being converted. *See Tustin v. Baker*, No. 93,250, 2005 WL 2254497, at *10 (Kan. App. Sept. 16, 2005) (conversion claim relating to a real estate interest was "more properly stated [as] breach of fiduciary duty or negligence, not conversion."). According, the Bowerses'  claim that the defendants converted their "chain of title" fails to state a claim under Kansas law.

The Bowerses' fraud claim asserts that the defendants committed fraud by recording to Caveat. Under Kansas law, fraud is "an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment." *Alires v. McGehee*, 277 Kan. 398, Syl. ¶ 3, 85 P.3d 1191 (2004). Further, "[f]raud is never presumed and must be established by clear and convincing evidence." *Id*. at Syl. ¶ 1. In the present case, the Bowerses fraud claim fails because the Caveat represented a truthful statement (that the Bowerses had not satisfied the underlying

32

debt), and the Bowerses never personally relied upon it (discovering only in the course of the present litigation), and did not do so to the detriment (since they have not attempted to sell their house and have failed to show that any third party has ever seen the document and acted against their interests.

Next, the Bowerses claim that the defendants acted negligently in recording the caveat. The court finds that this claim fails for the same reasons as rest of common law tort claims. The recording of the caveat corrected the prior mistaken release of lien, and was an action authorized under Kansas law. As a result it did not breach any duty of due care owed to the Bowers. But the negligence claim also fails for a more fundamental reason. As lender and borrower, Wells Fargo and the Bowerses had an adversarial relationship, and Wells Fargo was not obligated to act in the Bowerses' interest. *Jack v. City of Wichita*, 23 Kan. App.2d 606, 614, 933 P.2d 787, 793 (1997) ("Kansas law recognizes the borrower/lender relationship has an adversarial character [which] is not the sort of 'special relationship' which justifies imposing a duty" of due care). Defendants MERS and Lorna Slaughter, acting as agents of Wells Fargo, similarly had no duty which was breached under the facts of the case.

The KCPA prohibits deceptive practices in consumer transactions. A consumer transaction is "a sale, lease, assignment or other disposition for value of property or services within this state … to a consumer." K.S.A. 50-624(c). In the present case, the communications between the Bowerses and Wells Fargo were financial communications relating to a mortgage obligation, and thus do not fall within the scope of the KCPA. *See*

33

*Cornerstone Homes v. Skinner*, 44 Kan.App.2d 88, 100, 235 P.3d 494, 502 (Kan. App. 2010) (noting that provisions of KCPA "make no mention of debt collection practices or the manner in which a seller might exercise its remedies"); *Mortgage. Elec. Registration Sys., Inc. v. Graham*, 247 P.3d 223, 231 (Kan. App. 2010) (KCPA did not apply to communications about a mortgage loan in default). Further, the Bowerses fail to state a claim under the KCPA because they have shown no deceptive practice. The Caveat, as noted above, corrected the earlier erroneous release of the mortgage lien.

Finally, the Bowerses did not assert their RESPA claim until March, 2012, with their Amended Complaint.  Such claims are subject to a one-year limitations period pursuant to 12 U.S.C. § 2614. Because the Bowerses' RESPA claim was brought more than one year  after the closing of either the 2008 loan or the proposed new loan of 2009, the claim is time-barred.

In addition to summary judgment as to the Bowerses' various tort claims, Wells Fargo also seeks summary judgment on its counterclaims for equitable remedies. Specifically, it seeks either (a) equitable reinstatement of the October, 2008 mortgage, (b) an equitable mortgage based on the terms of the proposed new loan, or (c) judgment on its claim of unjust enrichment against Roy Bowers. The court finds that it need not separately address the alternate forms of relief sought by the defendants, as the facts demonstrate that Wells Fargo is entitled to equitable reinstatement of the 2008 mortgage.

The facts demonstrate that the 2009 loan never closed, and that Wells Fargo continues to

possess the original 2008 Note. The 2008 mortgage was released because Wells Fargo was misinformed by the closing agent that the closing had occurred. Wells Fargo paid the original note from its own funds, and began to issue a series letters to the Bowerses which clearly manifested this misunderstanding. The Bowerses never attempted to correct the Wells Fargo to state that the closing had in fact never occurred. It is uncontroverted that the Bowerses have never paid off the 2008 mortgage loan.

Under these circumstances, the court has the power under Kansas law to equitably reinstate a mortgage which has been released in error.

> "It is well settled in this state that a receipt furnished only prima facie evidence of the declarations and admissions which it contains, and that a party giving a receipt admitting payment in full has a right to show that it is untrue." [*St. Louis, Ft. S. & W.*] *Railroad Co. v. Davis*, 35 Kan. 464, 11 Pac. 421 [(1886)]. Neither is a release entered upon the records conclusive upon the parties where payment was not made, and it appears to have been done by accident or mistake. In such a case, equity will intervene, and grant relief. The cancellation of the mortgage is to be regarded as only prima facie evidence of its discharge; and the party asking relief may show that the release was made by fraud, accident, or mistake. When that is shown, the mortgage will be held and enforced as a valid security. [T]here can be no doubt that, as between the parties themselves, the release is to be treated as a nullity, and that the plaintiff is entitled to a foreclosure of its mortgage.

*Southern Kansas Farm, Loan & Trust v. Garrity*, 57 Kan. 805, 48 P. 33, 33-34 (1897). *See also*

*Mid-Continent Lodging Assocs. v. First National Bank of Chicago*, 999 F. Supp. 1443, 1447

(D. Kan. 1998)(mortgage remained valid under Kansas law notwithstanding mistaken

release).

The court notes that the Bowerses repeatedly stress that any new equitable

mortgage will lack FHA mortgage insurance. But, as noted in the findings of uncontroverted fact, the loan documents explicitly recognized that the loan obligation existed independently of the actual existence of mortgage insurance. More importantly, once the loan is actually issued, such mortgage insurance benefit is purely a benefit to the lender rather than the borrower.

Accordingly, the court grants Wells Fargo judgment on its counterclaim seeking an equitable mortgage in the Property on terms consistent with the 2008 mortgage and loan agreements.

*Additional Motions*

In addition to the summary judgment motion of the defendants, three other motions are pending before the court. First, the Bowerses have also filed a Motion to Strike (Dkt.  219) the defendants' counterclaim. Second, Wells Fargo has moved for default judgment on its counterclaim. (Dkt. 221). Finally, the defendants have moved to strike the Second Amended Complaint of the Bowers. (Dkt.  224).

The first two motions are linked, and the court will deny both. The plaintiffs' Motion to Strike was filed outside the time for such a pleading under Fed.R.Civ.Pr. 12(A)(1)(b), and is properly denied as untimely. At the same time, however, the court in its discretion finds that the plaintiffs have expressed their opposition to the counterclaim and accordingly will not find the plaintiffs in default as to the counterclaim.

36

The defendants' Motion to Strike is hereby granted. The Bowerses sought no leave of court before filing the Second Amended Complaint. Further, the fact that (now dismissed) defendant *First American* moved to dismiss their First Amendment Complaint, the Bowerses were not entitled under Fed.R.Civ.Pr. 15(a) to a free amendment of their Complaint by advancing new and additional facts and claims against the *other defendants* in the action. *See Villery v. District of Columbia*, 277 F.R.D. 218, 219 (D.D.C. 2011). The court further finds that given the extensive discovery conducted by the parties, coupled with the simultaneous and exhaustive briefing on dispositive motions, the defendants would be substantially prejudiced by such far-reaching changes to the plaintiffs' claims.

In their Response (Dkt. 228) ostensibly dealing with the issues addressed in this section, the Bowerses actually address only their own Motion to Strike (Dkt. 219) and the defendants' Motion for Default (Dkt. 221). The Bowerses make no response to the defendants' request to strike their Second Amended Complaint as untimely, contrary to rule, and tending to work substantial and unfair prejudice to the defendants. Accordingly, the defendants' Motion to Strike is hereby granted both for good cause shown and as an unopposed motion under D.Kan.R. 7.4. However, the court in its discretion hereby denies the defendants' request for their attorney fees in preparing their Motion to Strike.

IT IS ACCORDINGLY ORDERED this 4th day of October, 2012, that the plaintiffs' Motion to Strike (Dkt. 219) and the defendants' Motion for Default Judgment

(Dkt.  221) are denied; defendants' Motions to Strike (Dkt.  224) and for Summary

Judgment (Dkt.  230) are granted as provided herein.


　s/ J. Thomas Marten　　
J. Thomas Marten, Judge